36 A.3d 928

Donald SPANGLER, et al.

v.

Peggy McQUITTY and Gary McQuitty,
as Personal Representatives of the
Estate of Dylan McQuitty.

No. 23, Sept. Term, 2011.

Court of Appeals of Maryland.

Jan. 27, 2012.

528

D.C. Offutt, Jr. (Offutt Nord, PLLC, Huntington, West Virginia; Robert J. Farley of Wharton, Levin, Ehrmantraut & Klein, P.A., Annapolis, MD), on brief, for Appellants.

Henry E. Dugan, Jr. (Bruce J. Babij and George S. Tolley III of Dugan, Babij & Tolley, LLC, Timonium, MD), on brief, for Appellees.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, JOHN C. ELDRIDGE, (Retired, Specially Assigned), JJ.

BATTAGLIA, J.

In this case, we have been asked to sit in judgment once again in the case of *McQuitty v. Spangler*, about which we previously opined, 410 Md. 1, 976 A.2d 1020 (2009) (hereinafter *McQuitty I*). In a series of post-trial motions following *McQuitty I*, Appellant, Dr. Donald Spangler, moved to reduce the verdict in favor of the Appellees, Dylan McQuitty and his parents Peggy and Gary McQuitty. After the verdict, but prior to resolution of the post-trial motions, Dylan died. Dr. Spangler argued, among numerous other contentions, that Dylan's death absolved the portion of the judgment allocated to Dylan's future medical expenses; Judge Michael J. Finifter of the Circuit Court for Baltimore County disagreed. Dr. Spangler appealed to the Court of Special Appeals, but prior to any proceedings in the intermediate appellate court, we granted certiorari to consider the following questions:

1. Whether, under Maryland law, a litigant is denied due process of law where a trial court denies a motion for

new trial following the Court of Appeals of Maryland's substantive change of the common law of informed consent.

2. Whether, under Maryland law, a trial court abuses its discretion by entering judgment in favor of the estate of a deceased plaintiff where an award for future medical care is included as one of the elements of damages in the judgment entry.

3. Whether, under Maryland law, a settling defendant may increase the liability of a non-settling defendant merely by designating himself a non-joint tortfeasor.

4. Whether, under Maryland law, a litigant can alter or change Maryland's law by contractual agreement and thereby preclude a settling tortfeasor from being classified as a "joint tortfeasor" under the Uniform Contribution Among Joint Tort–Feasors Act to the detriment of a non-settling tortfeasor who was not a party to the agreement.

5. Whether, under Maryland law and the circumstances of this case, Post Judgment Interest should run from the last date final judgment is entered, where the original judgment was vacated due to the trial court's grant of the defendant's judgment notwithstanding the verdict.

We shall affirm the trial court's denial of Dr. Spangler's motions for post-trial relief, because our holding in *McQuitty I* did not substantively change the Maryland common law of informed consent. We also shall hold that the post-verdict death of Dylan does not absolve Dr. Spangler from the finality of the jury's award of future medical expenses. In addressing Dr. Spangler's third and fourth questions together, we shall hold that the Franklin Square Hospital, for which summary judgment was entered in its favor as to liability and damages during the first case, was not a "joint tort-feasor" under Maryland's Uniform Contribution Among Tort–Feasors Act, Sections 3–1401 to –1409 of the Courts & Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.), such that its settlement release from the McQuittys did not entitle Dr.

Spangler to a reduction of the judgment against them. We finally shall hold that post-judgment interest on the verdict accrued from the date of the original judgment.

## I. Background [1]

Dylan McQuitty, by and through his parents Peggy and Gary McQuitty (together "the McQuittys"), successfully sued Ms. McQuitty's obstetrician and primary care physician, Donald Spangler, and his practice, Glowacki, Elberfeld & Spangler, P.A. (together "Dr. Spangler") for having failed to obtain her informed consent to treatment,[2] after which Ms. McQuitty suffered complete placental abruption [3] that resulted in severe injuries to Dylan during his birth in 1995.

In the original complaint, the McQuittys also named as defendants the Hospital where Dylan was born, Franklin Square Hospital Center, Inc, and Dr. Spangler's partner, Harrold Elberfeld. Franklin Square Hospital moved for summary judgment as to liability and damages, which was granted by the Circuit Court, and both the Hospital and Dr. Elberfeld settled with the McQuittys before trial. Franklin Square

---

**1.** The underlying facts of the informed consent claim and its resolution are set forth in detail in *McQuitty v. Spangler*, 410 Md. 1, 976 A.2d 1020 (2009) (*McQuitty I* ), so that we provide here only those relevant to Dr. Spangler's present appeal.

**2.** Specifically, Dr. Spangler failed to inform Ms. McQuitty "of risks and available alternative treatments related to material changes in her pregnancy, those being a second partial-placental-abruption, oligohydramnios, and intrauterine growth restriction," all three conditions posing significant risks to the baby. 410 Md. at 3, 976 A.2d at 1021–22.

**3.** Placental abruption was defined in *McQuitty I* as:

The placenta is a structure that develops in the uterus during pregnancy to nourish the growing baby. If the placenta peels away from the inner wall of the uterus before delivery—either partially or completely—it's known as placental abruption. Placental abruption can deprive the baby of oxygen and nutrients and cause heavy bleeding in the mother. Left untreated, placental abruption puts both mother and baby in jeopardy.

410 Md. at 3, 976 A.2d at 1021, quoting Placental Abruption—Mayo Clinic.com, http://www.mayoclinic.com/health/placental-abruption/DS 00623.

Hospital's Release and Settlement of Claim provided that the Hospital would be considered a "joint tortfeasor" only if it was "adjudicated to be a joint tortfeasor by a final judgment of a court of record after trial on the merits." In contrast, Dr. Elberfeld's release provided that he would be considered a "joint tortfeasor." These settlements were entered on the record and the case proceeded, on the informed consent claim, with Dr. Spangler and his practice as the sole defendants.

Prior to trial on the informed consent claim, Dr. Spangler also moved for summary judgment, arguing that he had no duty to obtain the informed consent of Ms. McQuitty regarding a placental abruption because he did not conduct or propose an "affirmative invasion of her physical integrity." *McQuitty I*, 410 Md. at 13–14, 976 A.2d at 1027–28. The motion was denied, and, eventually, a trial ensued.

The jury awarded Dylan $13,078,515.00 in damages, including $8,442,515.00 in future medical expenses. Dr. Spangler filed a Motion for Remittitur and a Motion for Judgment Notwithstanding the Verdict, again asserting that the doctrine of informed consent required "an affirmative invasion of physical integrity." The Circuit Court granted a judgment notwithstanding the verdict in favor of Dr. Spangler, and the Court of Special Appeals affirmed.

We ultimately reversed the grant of judgment notwithstanding the verdict in *McQuitty I*, concluding that physical invasion was not a prerequisite to a physician's duty to obtain a patient's informed consent. Rather than battery, we recognized that personal autonomy and personal choice of the patient were foundational for the informed consent doctrine. We observed that our prior opinion applying the doctrine, *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993), did reference, but that it did not rely upon, *Karlsons v. Guerinot*, 57 A.D.2d 73, 394 N.Y.S.2d 933 (1977), a New York case requiring an affirmative physical invasion of the patient before the physician's duty to obtain the informed consent of the patient arose. We explained that the New York doctrine of informed consent relied upon battery rather than negligence,

which contrasted with our own common law that "a lack of informed consent claim is clearly predicated on negligence and the gravamen is the healthcare provider's duty to provide information, rather than battery or the provider's physical act." 410 Md. at 31, 976 A.2d at 1038. We, therefore, reversed the Circuit Court's grant of judgment notwithstanding the verdict and remanded with instructions that the Circuit Court consider Dr. Spangler's unresolved Motion for Remittitur.

Dylan McQuitty, however, died on September 26, 2009, prior to the trial court's resolution of the remittitur. Dr. Spangler then filed various post-trial motions seeking a new trial or a reduction in the award of future medical expenses, alleging that Dylan's death was a "significant event [affecting] the equities of this case" and seeking a reduction of future medical expenses to only be those actually expended. He also argued that our opinion in *McQuitty I* "overruled a consistent line of procedural decisions upon which Dr. Spangler based his defense," so that the application of *McQuitty I* to the case, without a new trial, constituted a deprivation of due process of law.

Judge Finifter denied the Motion for Revision of Judgment but denied in part and granted in part Dr. Spangler's Motion for Remittitur. Judge Finifter reduced the jury's award, pursuant to the statutory cap on non-economic damages of $500,000, under Section 11–108(b)(2)(i) of the Courts & Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.) and then reduced the judgment by fifty percent to reflect Dr. Elberfeld's *pro rata* share of liability, pursuant to Dr. Elberfeld's joint tortfeasor release from the McQuittys and the Uniform Contribution Among Tort–Feasors Act, Section 3–1404 of the Courts & Judicial Proceedings Article.[4] Judge

---

4. Section 3–1404 of the Courts & Judicial Proceedings Article, Maryland Code (1973, 2006 Repl. Vol.) provides:

A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides, but it reduces the claim against the

Finifter denied Dr. Spangler's requests to permit the payment of future economic damages in the form of periodic payments under Section 11–109(c) of the Courts & Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.),[5] to further reduce the jury's award by the Franklin Square Hospital's settlement amount, as the Hospital had not been judicially determined to be a joint tort-feasor, and finally that no post-judgment interest be calculated. Judge Finifter ultimately concluded that the judgment should be reduced to $5,039,257.50, plus post-judgment interest "calculated from the date of the entry of Judgment, September 27, 2006, plus costs."

Dr. Spangler filed a Renewed Motion for New Trial on Due Process Grounds, Renewed Motion for New Trial on Due Process Grounds (Amended) ("Amended Motion for New Trial") and Motion for the Court to Order a New Trial, or to Conditionally Order a New Trial Unless Plaintiffs Agree to a Remittitur, Pursuant to Maryland Rule 2–533[6] or, in the

---

other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

**5.** Section 11–109(c) of the Courts & Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.) provides, in pertinent part:

(c) *Form of award for future economic damages; appointment of conservator.*—(1) The court or the health claims arbitration panel may order that all or part of the future economic damages portion of the award be paid in the form of annuities or other appropriate financial instruments, or that it be paid in periodic or other payments consistent with the needs of the plaintiff, funded in full by the defendant or the defendant's insurer and equal when paid to the amount of the future economic damages award.

**6.** Rule 2–533 provides, in pertinent part:

(b) Grounds. All grounds advanced in support of the motion shall be filed in writing within the time prescribed for the filing of the motion, and no other grounds shall thereafter be assigned without leave of court.

(c) Disposition. The court may set aside all or part of any judgment entered and grant a new trial to all or any of the parties and on all of the issues, or some of the issues if the issues are fairly severable. If a partial new trial is granted, the judge may direct the entry of

Alternative, to Alter, Amend, or Revise the Judgment Entered Against Them Pursuant to Maryland Rules 2–534 [7] and 2–535.[8] In his motions, Dr. Spangler again argued that *McQuitty I* changed the common law, which required that the case be retried and also that Dylan's death served as grounds for

judgment as to the remaining parties or issues or stay the entry of judgment until after the new trial. When a motion for new trial is joined with a motion for judgment notwithstanding the verdict and the motion for judgment notwithstanding the verdict is granted, the court at the same time shall decide whether to grant that party's motion for new trial if the judgment is thereafter reversed on appeal.

7. Rule 2–534 provides:

In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial. A motion to alter or amend a judgment filed after the announcement or signing by the trial court of a judgment but before entry of the judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket.

8. Rule 2–535 provides, in pertinent part:

(a) Generally. On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534. A motion filed after the announcement or signing by the trial court of a judgment or the return of a verdict but before entry of the judgment on the docket shall be treated as filed on the same day as, but after, the entry on the docket.

(b) Fraud, mistake, irregularity. On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

(c) Newly-discovered evidence. On motion of any party filed within 30 days after entry of judgment, the court may grant a new trial on the ground of newly-discovered evidence that could not have been discovered by due diligence in time to move for a new trial pursuant to Rule 2–533.

(d) Clerical mistakes. Clerical mistakes in judgments, orders, or other parts of the record may be corrected by the court at any time on its own initiative, or on motion of any party after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed by the appellate court, and thereafter with leave of the appellate court.

reopening and revising the damages award, specifically by reducing the future medical expenses award to that which was actually expended prior to his death. These motions were denied by Judge Finifter and this appeal followed.

## II. Discussion

Dr. Spangler invokes Maryland Rule 2–535 to revisit the jury's verdict. This rule provides, in pertinent part:

Rule 2–535. Revisory power

(b) Fraud, mistake, irregularity. On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

He contends that he is entitled to a new trial because our opinion in *McQuitty I* changed the common law and was therefore an "irregularity." We have clarified, however, that an irregularity in the context of this Rule is "a failure to follow required process or procedure." *Radcliff v. Vance*, 360 Md. 277, 292, 757 A.2d 812, 820 (2000), citing *Early v. Early*, 338 Md. 639, 652, 659 A.2d 1334, 1340 (1995). Clearly, our opinion in *McQuitty I* was not such a failure.

He also contends that our opinion in *McQuitty I* changed the doctrine of informed consent, and due process entitles him to a new trial. He argues that our opinions in *Reed v. Campagnolo*, 332 Md. 226, 630 A.2d 1145 (1993), and *Landon v. Zorn*, 389 Md. 206, 884 A.2d 142 (2005) and the Court of Special Appeals's opinion in *Arrabal v. Crew–Taylor*, 159 Md.App. 668, 862 A.2d 431 (2004), required "an affirmative violation of the patient's physical integrity" before the physician's duty to obtain informed consent arose, and that our opinion in *McQuitty I* removed that requirement. He maintains that he would not have pursued the same litigation strategy, had he known that the law would be as we enunciated in *McQuitty I*.

Our opinion in *McQuitty I* explored the doctrine of informed consent and reaffirmed that physical invasion was not a prerequisite to the physician's duty to obtain the informed con-

sent from a patient, because battery was not foundational. We reiterated that the recognition of personal autonomy and negligence, rather than battery, always steered the doctrine before and after *Reed* and *Landon.* Not only did *McQuitty I* not alter Maryland common law, but Dr. Spangler had more than ample opportunity to be heard regarding his contention that it did before the trial and on appeal when he asserted the claim in his motion for summary judgment that battery was a requirement of informed consent. Dr. Spangler clearly knew before his presentation at trial that he needed to address informed consent, without the necessity of a battery.

In his second question before us, Dr. Spangler contends that Dylan's post-verdict death warrants a reduction of the award of future medical expenses to compensate for only that which was actually expended by Dylan prior to his death. From the outset, it is noteworthy in this regard that Dr. Spangler, in his original Motion for Remittitur filed prior to our opinion in *McQuitty I,* requested that all future economic damages be paid in the form of annuities or periodic payments, pursuant to Section 11–109(c) of the Courts & Judicial Proceedings Article, Maryland Code (1973, 2006 Repl.Vol.), which provides that a court "may order all or part of the future economic damages portion of the award be paid in the form of annuities...." [9] When the motion was heard following

---

**9.** Section 11–109 provides, in pertinent part:
  (a) *"Economic damages" defined.*—(1) In this section, "economic damages" means loss of earnings and medical expenses.
  (2) "Economic damages" does not include punitive damages.
  (b) *Itemized award.*—As part of the verdict in any action for damages for personal injury in which the cause of action arises on or after July 1, 1986 or for wrongful death in which the cause of action arises on or after October 1, 1994, the trier of fact shall itemize the award to reflect the monetary amount intended for:
  (1) Past medical expenses;
  (2) Future medical expenses;
  (3) Past loss of earnings;
  (4) Future loss of earnings;
  (5) Noneconomic damages; and
  (6) Other damages.
  (c) *Form of award for future economic damages; appointment of conservator.*—(1) The court or the health claims arbitration panel

Dylan's death, Dr. Spangler argued that Section 11–109(c) "reflects Maryland law that there should not be a windfall, ... that the damages paid should reflect the actual damages incurred ... [and] under that statute there is an implicit authority of this court to strike the future medical and rehab damages from the verdict" but did not argue that he should be granted an annuity award, which would end his liability for medical expenses upon Dylan's death pursuant to Section 11–109(d). Judge Finifter denied Dr. Spangler's request.

Before us, Dr. Spangler does not challenge the trial court's denial of his request for annuitization under Section 11–109(c), but argues that Section 11–109(d), which provides that "[i]f the plaintiff under this section dies before the final periodic payment of an award is made, ... the unpaid balance of the award for future medical expenses shall revert to the defendant," precludes Dylan's estate from receiving any of the original award for future medical expenses, other than that actually incurred prior to Dylan's death. In essence, Dr. Spangler argues that even though he was not awarded the benefit of periodic payments, Dylan was given only a life estate in the award for medical expenses, with the remainder to Dr. Spangler.

The McQuittys counter with the "death of a personal injury plaintiff at any time after a jury verdict is not grounds for extinguishing the award of future damages, reopening the evidence, or otherwise providing the basis for relief from the

---

may order that all or part of the future economic damages portion of the award be paid in the form of annuities or other appropriate financial instruments, or that it be paid in periodic or other payments consistent with the needs of the plaintiff, funded in full by the defendant or the defendant's insurer and equal when paid to the amount of the future economic damages award.

*     *     *

(d) *Death of plaintiff before final payment of award.*—If the plaintiff under this section dies before the final periodic payment of an award is made, the unpaid balance of the award for future loss of earnings shall revert to the estate of the plaintiff and the unpaid balance of the award for future medical expenses shall revert to the defendant or to the defendant's insurer if the insurer provided the funds for the future damages award.

entry of a final judgment[;]" to hold otherwise would contravene the public policy in favor of the finality of judgments and extend litigation interminably. The importance of finality, the McQuittys argue, motivated the United States Circuit Court for the Sixth Circuit in *Davis v. Jellico Community Hospital, Inc.*, 912 F.2d 129 (1990), and a United States District Court in *Boyd v. Bulala,* 672 F.Supp. 915 (W.D.Va.1987), to conclude that the death of the plaintiff following trial but before the resolution of post-trial motions does not constitute a basis to reduce a judgment, because "[t]he defendant cannot, by his argument, be allowed to profit from the [plaintiff's] premature death by securing a reduction in the judgment." *Boyd,* 672 F.Supp. at 923. As to Section 11–109(d), the McQuittys respond that the return of all future medical expenses following the premature death of the prevailing party is required only where an annuity payment system is obtained under Section 11–109(c), which was not the case here.

We have occasion to write on a clean slate when we address the impact of the death of a prevailing party on an award of future medical expenses after a judgment notwithstanding the verdict was entered but was reversed on appeal and the case was returned for consideration of a motion for remittitur. Dr. Spangler urges that the notion of equity favors a reduction of damages under these circumstances, but we note that when that policy has been embraced, it has been explicated in statutes, such as Wisconsin,[10] which provides that

---

**10.** Section 655.015 of the Wisconsin Statutes (2004) provides:

If a settlement or judgment under this chapter resulting from an act or omission that occurred on or after May 25, 1995, provides for future medical expense payments in excess of $100,000, that portion of future medical expense payments in excess of an amount equal to $100,000 plus an amount sufficient to pay the costs of collection attributable to the future medical expense payments, including attorney fees reduced to present value, shall be paid into the fund. The commissioner shall develop by rule a system for managing and disbursing those moneys through payments for these expenses, which shall include a provision for the creation of a separate accounting for each claimant's payments and for crediting each claimant's account with a proportionate share of any interest earned by the fund, based on that account's proportionate share of the fund. The commissioner

future medical expenses over a given amount, assessed against a health care provider, shall be paid in periodic payments that will cease upon the recipient's death.

Similar statutory provisions to that in Wisconsin do not exist in Maryland. Section 11–109, rather, permits the payment of future economic damages to be annuitized, with the trial court's discretion. The subsequent death of the prevailing party, then, would warrant cessation of periodic payments for future medical damages. Here, however, Dr. Spangler has not appealed from the denial of the annuity award as an abuse of the trial court's discretion; he urges us, rather, to obviate the legislative mandate by holding that every award, whether annuitized or not, warrants cessation of an award of future medical expenses at death.

In the absence of a statute mandating reversion of the remainder of future medical expenses following the death of the recipient, some of our sister courts addressing the same issue have ruled that finality is the valued norm. In *Davis v. Jellico Community Hospital, Inc.*, the Court of Appeals for the Sixth Circuit observed that Tennessee law did not "establish structured damage awards with built-in contingencies for deaths well before a plaintiff's expected life span." 912 F.2d at 135. In that case, Jackie Davis was awarded a $2.5 million judgment but died thirty-three days later, while his doctors and hospital's motion for judgment notwithstanding the verdict was still pending. After Mr. Davis's death, the doctors and the hospital amended their post-trial motion, seeking a new trial on the issue of damages. The district court denied their post-trial motions under the Federal Rules of Civil Procedure 59 [11] and 60, [12] reasoning that evidence adduced

---

shall promulgate a rule specifying the criteria that shall be used to determine the medical expenses related to the settlement or judgment, taking into consideration developments in the provision of health care. The payments shall be made under the system until either the account is exhausted or the patient dies.

**11.** Federal Rule of Civil Procedure 59(a) currently provides, in pertinent part:

regarding Mr. Davis's life span supported the verdict, was not false, and was rebuttable, albeit unsuccessfully, at trial.

On appeal, the Sixth Circuit affirmed, citing cases denying motions to reopen and modify judgments in light of an apparent improvement or decline in the prevailing party's health discovered following trial and concluding that finality outweighed claims of inequity in damages awarded. *Id.* at 136, citing *Still v. Townsend,* 311 F.2d 23, 23–24 (6th Cir.1962) and *Campbell v. American Foreign S.S. Corp.,* 116 F.2d 926, 928 (2d Cir.1941). The Sixth Circuit reasoned that,

> [t]he defendants in this and every other tort case well know that a plaintiff may not survive to fully enjoy an award of damages. It is the defendant's responsibility to make clear to the fact finder that the plaintiff could die as soon as he or she leaves the courthouse.

---

(1) *Grounds for New Trial.* The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or (B) after a nonjury trial, for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court.

(2) *Further Action After a Nonjury Trial.* After a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment.

**12.** Federal Rule of Civil Procedure 60 currently provides, in pertinent part:

(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1) mistake, inadvertence, surprise, or excusable neglect;

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6) any other reason that justifies relief.

*Id.* at 136. The court concluded that the doctors and hospital could not circumvent finality by reopening this case to limit damages awarded to Mr. Davis. *Id.*

Similarly, in *Boyd v. Bulala*, 672 F.Supp. 915 (W.D.Va. 1987), the United States District Court for the Western District of Virginia denied a motion for post-judgment relief after the prevailing party Veronica Lynn Boyd, an infant born with severe cerebral palsy, died approximately six weeks after trial. 672 F.Supp. at 922. In denying the motion, the district court considered the physician's request to "weigh the equities of this case against the rule regarding the finality of judgments," and resolved that "[t]his balancing test is seriously flawed . . . [b]ecause the weight accorded to the finality of judgment necessarily increases as time passes, [the test] would allow relief when the plaintiff dies prematurely, but would deny relief when the plaintiff lives longer than expected." *Id.* at 923. A post-verdict death of the prevailing party could not disturb the finality of the judgment: "Were the rule otherwise, litigation would never end. . . . The defendant cannot, by his argument, be allowed to profit from the child's premature death by securing a reduction in the judgment." *Id.* at 922–23.

In the present case, taking into consideration the absence of annuitization of medical payments, we determine that the finality of judgment must be the norm; otherwise litigation could continue interminably.

■ Dr. Spangler also contends that he is entitled to a reduction in the jury's award for the amount the Franklin Square Hospital paid the McQuittys. Franklin Square, in the original trial, was granted summary judgment as to both liability and damages but, thereafter, settled with the McQuittys for $500,000. In a Release and Settlement of Claim, the McQuittys agreed to discharge all claims against the Hospital related to Dylan's injuries and damages. The Release further specified that any future judgment awarded to the McQuittys would be reduced by the Hospital's pro rata share of liability, pursuant to the Uniform Contribution Among Tort–Feasors

Act, Section 3–1404 of the Courts & Judicial Proceedings Article, should the Hospital be judicially determined to be liable:

> It is further understood and agreed that if the Releasing Party [i.e., the McQuittys] files or pursues a lawsuit or other claim against someone other than the Released Parties [i.e., the hospital and its insurers] seeking recovery for damages as a result of or relating to the Occurrence, and if, in any such lawsuit or claim in relation to that lawsuit, a cross-claim, third-party claim or other claim is brought against the Released Parties, then any and all damages recoverable by the Releasing Party . . . shall be reduced by the statutory *pro rata* share(s) of the Defendant in accordance with the Uniform Contribution Among [Tort-feasors] Act, Section 3–1401, *et seq.*, Md. Cts. & Jud. Proc.Code Ann., but only on the condition that the issue of liability of Franklin Square Hospital Center, Inc. is actually presented for judicial decision and the Franklin Square Hospital Center, Inc. is adjudicated to be a joint tortfeasor by a final judgment of a court of record after trial on the merits. Then and only in that event, the Releasing Party agrees and stipulates that all damages incurred by the Releasing Party resulting from the Occurrence and recoverable by the Releasing Party against anyone other than the Released Parties, will be reduced under the provisions of the Uniform Contribution Among Tort-feasors Act, as set forth above.

Although Dr. Spangler had not preserved any direct action against the Hospital nor had the Hospital been judicially determined to be liable, he urged in his Motion for Remittitur that he was entitled to a dollar for dollar set off for the Hospital's $500,000 settlement. The McQuittys conversely maintain that no such contribution was appropriate under the Release or the Uniform Contribution Among Tort–Feasors Act because the Hospital was judicially absolved of liability when the Circuit Court granted its motion for summary judgment.

Under the Uniform Contribution Among Tort–Feasors Act, "[t]he right of contribution exists among joint tort-feasors."

Section 3–1402(a) of the Courts & Judicial Proceedings Article. The term "Joint tort-feasors" is defined as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Section 3–1401(c) of the Courts & Judicial Proceedings Article.

Dr. Spangler contends that the trial court's denial of his request for *pro rata* contribution for Franklin Square Hospital's Release was erroneous, because "it is undisputed that [the Hospital] had independent liability for its care provided," and thus was a joint-tortfeasor whose settlement with the McQuittys should reduce the judgment against Dr. Spangler. He further argues that the Hospital's Release absolved the Hospital from contribution claims by other tort-feasors, in an effort to preclude Dr. Spangler from obtaining a reduction in the jury award, contrary to the purpose and effect of the Uniform Contribution Among Tort–Feasors Act. Finally, he argues that summary judgment in favor of the Hospital did not preclude the Hospital from having "joint-tort-feasor" status under the Uniform Act, because summary judgment was granted prior to the signing of the Release. The McQuittys respond that the Hospital was judicially determined not to be a joint tort-feasor, so that the McQuittys were not required to take a reduction in the judgment to reflect the Hospital's settlement.

The concept of joint tort-feasor status was succinctly summarized by Judge Sally D. Adkins, while an active member of the Court of Special Appeals, in the case of *Jacobs v. Flynn*, 131 Md.App. 342, 374–75, 749 A.2d 174, 191 (2000), in which she explained that a settling defendant, who is judicially determined to be liable or who admits liability in the settlement agreement, is a joint tort-feasor under the Uniform Contribution Among Tort-Feasors Act:

As the Court of Appeals recognized long ago, "[the Uniform Act] does not specify the test of liability. Clearly, something short of an actual judgment will suffice." *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428 (1957). The fact, however, that a party has been sued or threatened with

suit is not enough to establish joint tort-feasor status. *See Owens–Corning Fiberglas Inc. [Corporation] v. Garrett,* 343 Md. 500, 531–32, 682 A.2d 1143 (1996). Tort-feasor status, in the absence of adjudication, generally rests on admission by the purported tort-feasor of such status. Thus, a party will be considered a joint tort-feasor when it admits joint tort-feasor status in a settlement agreement, *see Martinez,* 300 Md. at 94–95, 476 A.2d 197, or if a default judgment has been entered against a party. *See Porter Hayden Co. v. Bullinger,* 350 Md. 452, 473–74, 713 A.2d 962 (1998) (because a default judgment is considered an admission of liability, it is sufficient to establish joint tort-feasor status). One will not be considered a joint tort-feasor, however, merely because he or she enters a settlement and pays money. *See Garrett,* 343 Md. at 532, 682 A.2d 1143. Where the settling parties specify in the release that the settling party shall not be considered a joint tort-feasor, monies paid on account of such settlement will be considered merely volunteer payments; a non-settling defendant judicially determined to be liable will not be entitled to a reduction of the damages awarded against it on account of the consideration paid by the settling party. *See id.* at 531–33, 682 A.2d 1143; *Collier v. Eagle Pitcher [Eagle–Picher] Indus., Inc.,* 86 Md.App. 38, 57, 585 A.2d 256, *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991).

In this case, the Hospital was a "volunteer" after it was granted summary judgment and then paid the McQuittys $500,000. Its release from the McQuittys so specified. The fact that the determination of no liability was made on summary judgment rather than after trial is of no moment because, as we have previously held, in *Porter Hayden Co. v. Bullinger,* 350 Md. 452, 470, 713 A.2d 962, 971 (1998), "when there is a judicial determination by *either a judge or jury* that the releasee is not liable, the releasee is not considered a joint tort-feasor, and section 3–1404 does not apply to reduce the plaintiff's claim against the nonsettling joint tort-feasor." (emphasis added).

We, finally, turn to the calculation of post-judgment interest, which is controlled by Maryland Rule 2–604(b):

(b) **Post-judgment interest.** A money judgment shall bear interest at the rate prescribed by law from the date of entry.

■ Dr. Spangler disputes the date of the entry of judgment in this case; he argues that the original verdict was set aside by the Circuit Court when it granted Dr. Spangler's motion for judgment notwithstanding the verdict, such that there was "no judgment prior to January 20, 2010," when the trial court granted in part and denied in part his Motion for Remittitur and entered judgment in favor of the McQuittys for $5,039,257.50. In the January 2010 order, however, Judge Finifter instructed that post-judgment interest be calculated from September 27, 2006, the date of the original judgment, because this Court's mandate of reversal was, "in effect, a finding that Plaintiff's original judgment always existed," quoting our decision in *Carpenter Realty Corp. v. Imbesi,* 369 Md. 549, 566, 801 A.2d 1018, 1028 (2002) and that of the Court of Special Appeals in *Brown v. Medical Mutual,* 90 Md.App. 18, 21, 599 A.2d 1201, 1204 (1992).

The purpose of post-judgment interest, as we stated in *I.W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 24, 344 A.2d 65, 79 (1975), is "to compensate the successful suitor for the same loss of the use of the monies represented by the judgment in its favor, and the loss of income thereon, between . . . when there is a judicial determination of the monies owed it and the satisfaction of the judgment by payment." In light of this purpose, we denied post-judgment interest in *Carpenter Realty Corp.,* 369 Md. at 568, 801 A.2d at 1029, where the original judgment, rendered in favor of the estate of Thomas L. Imbesi, was reversed on appeal.

■ In instances where judgments are entered following an appeal of a post-trial motion, it is within the sound discretion of the trial court to award post-judgment interest dating back to the entry of the original judgment, in pursuit of equitable principles, where the mandate of the appellate court does not expressly address the issue of post-judgment interest. *Imbe-*

*si*, 369 Md. at 561, 801 A.2d at 1025. In *Medical Mutual Liability Insurance Society v. Davis*, 365 Md. 477, 781 A.2d 781 (2001), we affirmed the trial court's award of post-judgment interest on a judgment that was reduced pursuant to a remittitur, from the date of the original judgment awarded by the jury. In so doing, we followed "the principle that post-judgment motions or appeals, which may cause a money judgment for a plaintiff to lose some aspects of its finality, ordinarily do not have the effect of postponing the accrual of post-judgment interest from the date that the original money judgment was entered." *Id.* at 486, 781 A.2d at 786.

Similarly, in *Brown v. Medical Mutual*, 90 Md.App. 18, 25, 599 A.2d 1201, 1204 (1992), the Court of Special Appeals ruled that post-judgment interest would accrue from the date of the original judgment in a case in which it reversed a subsequent judgment notwithstanding the verdict on appeal, reasoning that a reversal of a judgment notwithstanding the verdict equated to a finding that original judgment always existed:

> Here, the [judgment notwithstanding the verdict] was, in fact, *reversed* on appeal, which means that the original jury verdict must be reinstated as if it had never been eliminated by the trial court. A reversal on appeal of a [judgment notwithstanding the verdict] is, in effect, a finding that plaintiff's original judgment always existed.

The intermediate appellate court further observed that its prior mandate, which expressly instructed that post-judgment interest be calculated from the date of the original judgment's entry, supported its conclusion. *See id.* at 25, 599 A.2d at 1204.

In the case *sub judice*, our mandate in *McQuitty I*, reversing the trial court's grant of judgment notwithstanding the verdict,[13] did not expressly instruct the trial court to award post-judgment interest from the date of the original judgment

---

13. The mandate in *McQuitty I* provided:
   JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BAL-

in September 2006. *McQuitty I,* 410 Md. at 33, 976 A.2d at 1039. It is clear, however, from the language of *McQuitty I* that we reviewed and reversed the trial court's grant of judgment notwithstanding the verdict and remanded the case only "for consideration of the remittitur motion filed by Dr. Spangler, which was not decided," and not to reconsider the jury's verdict and judgment entered on September 27, 2006. 410 Md. at 33, 976 A.2d at 1039. Thus, the original judgment was reinstated. We, therefore, conclude that the trial judge, in effectuating the mandate in *McQuitty I,* did not abuse his discretion in ordering that the McQuittys be awarded post-judgment interest from the date of the original judgment on September 27, 2006.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

---

TIMORE COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.
410 Md. at 33, 976 A.2d at 1039.