*Donald B. Spangler, et al.  v. Peggy McQuitty, et vir.*, No. 69, September Term, 2015. Opinion by Hotten, J.

**WRONGFUL DEATH — LIMITATIONS — BENEFICIARIES RIGHT TO SUE — STATUTORY INTERPRETATION** — Maryland's wrongful death statute, § 3-901 *et seq*. of the Courts and Judicial Proceedings Article, creates a new and independent cause of action for a decedent's beneficiaries, and a judgment on the merits in a decedent's personal injury action during his or her lifetime does not bar a subsequent wrongful death action by the decedent's beneficiaries under the same underlying facts.

**WRONGFUL DEATH — LIMITATIONS — EFFECT OF RELEASE ON JOINT TORT-FEASORS —** Pursuant to the Maryland Uniform Contribution Among Tort-Feasors Act, § 3-1404 of the Courts and Judicial Proceedings Article, a release by an injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides.  Plain and unambiguous language that reveals an intent to release only one joint tort-feasor, cannot be interpreted to confer a general release as to all joint tort-feasors.

IN THE COURT OF APPEALS

OF MARYLAND

No. 69

September Term, 2015

_____

DONALD B. SPANGLER, et al.

v.

PEGGY McQUITTY, et vir.

_____

Barbera, C.J.
*Battaglia
Greene
Adkins
McDonald
Watts
Hotten,

JJ.

_____

Opinion by Hotten, J.

_____

Filed: July 12, 2016

*Battaglia, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the MD. Constitution, Article IV, Section 3A, she also participated in the decision and adoption of this opinion.

We consider, for the third time, the case of *McQuitty v. Spangler*, which we previously discussed in *McQuitty v. Spangler*, 410 Md. 1, 976 A.2d 1020 (2009) ("*McQuitty I*"), and *McQuitty v. Spangler*, 424 Md. 527, 36 A.3d 928 (2012) ("*McQuitty II*").[1] Specifically, we explore whether the definition of "wrongful act" under the Maryland wrongful death statute, Md. Code (2006, 2013 Repl. Vol.), §§ 3-901 through 3-904 of the Courts and Judicial Proceedings Article (Cts. & Jud. Proc."); specifically, § 3-901(e), precludes beneficiaries from maintaining a wrongful death action when the decedent obtained a personal injury judgment predicated on the same underlying facts during his lifetime. We also focus on whether a decedent's release of one joint tort-feasor in a personal injury action for any and all future claims in connection with the tortious conduct, also precludes the decedent's beneficiaries from pursuing a wrongful death action against all joint tort-feasors based on the same underlying facts.

For the reasons expressed below, we hold that Maryland's wrongful death statute creates a new and independent cause of action for a decedent's beneficiaries, and thus, a judgment on the merits in a decedent's personal injury action during his or her lifetime does not bar a subsequent wrongful death action by the beneficiaries. Additionally, we hold that pursuant to the Maryland Uniform Contribution Among Tort-Feasors Act, Cts. & Jud. Proc. § 3-1404, a release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides. Thus, where the language of a release unambiguously reveals an intent to release only one

---

[1] The underlying facts of the issues raised and its resolutions are outlined in detail in *McQuitty I* and *McQuitty II*. Only those facts relevant to the case at bar will be discussed.

joint tort-feasor, the release does not preclude a subsequent wrongful death action against other tort-feasors that were not parties to the release.  We explain.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prior Proceedings[2]

Respondents, Peggy and Gary McQuitty ("the McQuittys"), on behalf of their minor child, Dylan, successfully sued Ms. McQuitty's obstetrician and primary care physician, Donald Spangler ("Dr. Spangler"), along with his practice group, Glowacki, Elberfeld & Spangler, P.A. (collectively "Petitioners"), for failing to secure Ms. McQuitty's informed consent[3] for treatment.  As a result, Ms. McQuitty suffered complete placental abruption, causing severe injuries to Dylan during his birth in May of 1995, and eventually, a severe condition of cerebral palsy.

The original complaint also included co-defendants, Franklin Square Hospital, where Dylan was born, and Dr. Spangler's partner, Harrold Elberfeld ("Dr. Elberfeld"). Dr. Elberfeld and Franklin Square Hospital moved for summary judgment on liability and damages, which was subsequently granted by the Circuit Court for Baltimore County in March of 2004—on the same date Dr. Elberfeld settled with the McQuittys.  Franklin Square Hospital also settled with the McQuittys prior to trial, notwithstanding the summary

---

[2] The foregoing facts have been derived from *McQuitty I*, *McQuitty II*, and the parties' briefs.

[3] The underlying facts concerning the informed consent claim and its resolution are outlined in detail in *McQuitty I*.  Only those facts relevant to the case at bar will be discussed.

judgment ruling in its favor. The settlements were entered on the record and the case proceeded on the informed consent claim against Petitioners as sole defendants.

Prior to trial, Petitioners moved for summary judgment. Dr. Spangler alleged that he did not have a duty to obtain the informed consent of Ms. McQuitty regarding a placental abruption, "because he did not conduct or propose an 'affirmative invasion of her physical integrity.'" *McQuitty II* 424 Md. at 532, 36 A.3d at 931 (quoting *McQuitty I*, 410 Md. at 13–14, 976 A.2d at 1027–28). The motion was denied, and the trial ensued. The jury returned a verdict in favor of Dylan and awarded $13,078,515 in damages, including $8,442,515 in future medical expenses. Petitioners filed a Motion for Remittitur and a Motion for Judgment Notwithstanding the Verdict ("JNOV"), raising the same argument in support of their motion for summary judgment. The circuit court granted Petitioners' motion for JNOV, which was affirmed by the Court of Special Appeals in an unpublished opinion.

In *McQuitty I*, 410 Md. at 33, 976 A.2d at 1039, this Court reversed the grant of the JNOV, and remanded with instructions that the circuit court consider Petitioners' unresolved Motion for Remittitur. On September 26, 2009, prior to the resolution of the remittitur, Dylan died and the McQuittys were named as personal representatives of the Estate. Thereafter, Petitioners filed various post-trial motions, seeking a new trial or a reduction in the award for future medical expenses, alleging, *inter alia*, that Dylan's death was a "significant event" that affected the equities of the case.

The circuit court denied Petitioners' motion to revise the judgment, but denied in part and granted in part Petitioners' Motion for Remittitur. As a result, the court reduced

the initial jury award, pursuant to the statutory cap on non-economic damages of $500,000 under Cts. & Jud. Proc. § 11–108(b)(2)(i), and also reduced the judgment by fifty percent to reflect Dr. Elberfeld's *pro rata* share of liability, as a result of the joint tort-feasor release from the McQuittys, in compliance with the Uniform Contribution Among Tort–Feasors Act, under Cts. & Jud. Proc. § 3–1404.

The circuit court also denied Petitioners' requests to permit the periodic payment of future economic damages under Cts. & Jud. Proc. § 11–109(c), which would have reduced the jury's award by the Franklin Square Hospital's settlement amount. The court ultimately reduced the judgment to $5,039,257.50, plus post-judgment interest calculated from the date of the entry of judgment, on September 27, 2006, plus costs. Petitioners subsequently filed a renewed motion for a new trial and a motion to alter, amend, or revise the judgment, which were both denied. Thereafter, Petitioners noted a timely appeal to the Court of Special Appeals, but this Court granted *certiorari*, prior to that proceeding. In *McQuitty II*, 424 Md. at 529-30, 36 A.3d at 929-30, we affirmed the circuit court's judgment. Subsequently, on March 23, 2012, Petitioners satisfied the judgment.

### Respondents' Wrongful Death Action

On May 17, 2012, Respondents filed a wrongful death action against Petitioners, under the Maryland wrongful death statute, Cts. & Jud. Proc. § 3-901 *et seq.*, to recover damages based upon the same underlying facts in the personal injury action regarding Dr. Spangler's failure to obtain informed consent. On August 1, 2012, Petitioners filed a Motion to Dismiss Respondents' action. Following a December 6, 2012 hearing, the motion was granted. The circuit court concluded that Respondents' wrongful death action

- 4 -

was precluded by the judgment in Dylan's favor "because Dylan no longer had a right to bring another claim against [ ] [Petitioners] at the time of his death." Subsequently, on January 4, 2013, Respondents appealed the judgment.

While the matter was pending before the Court of Special Appeals, this Court issued its opinion in *Mummert v. Alizadeh*, 435 Md. 207, 77 A.3d 1049 (2013), which concerned similar issues to those presented here regarding the definition of "wrongful act" under Cts. & Jud. Proc. § 3-901(e). In *Mummert*, the decedent's husband and three children brought a wrongful death action against the decedent's physician, based on a failure to timely diagnose the decedent's colorectal cancer. *Id*. at 210-11, 77 A.3d at 1051. The physician filed a motion to dismiss the wrongful death action because the statutory three-year period in the wrongful death statute had expired relative to the decedent's personal injury action prior to her death. *Id*. The motion was subsequently granted. *Id*. at 211, 77 A.3d at 1052.

Accordingly, the narrow question before this Court in *Mummert* was whether the decedent's failure to file a personal injury claim in her lifetime within the limitations period, precluded her wrongful death beneficiaries from filing a wrongful death action based upon the same negligent act after her death. *Id*. at 212, 77 A.3d at 1051-52. In reversing the circuit court's dismissal of the action, we held that, in enacting the wrongful death statute, the General Assembly "did not intend to define 'wrongful act' so as to render a wrongful death claim contingent on the decedent's ability to file timely a tort claim prior to death." *Id*. at 210, 77 A.3d at 1051. We also held that the "statute of limitations for bringing tort claims against health care providers in instances of alleged medical negligence does not apply to a claim for wrongful death." *Id*.

- 5 -

In so holding, we reaffirmed the independent nature of wrongful death actions established in *Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 65 A. 49, 53 (1906), which provided that a wrongful death action was enacted to allow surviving relatives and beneficiaries "who [were] wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death." *Mummert*, at 219-20, 77 A.3d at 1056.

We also observed that a wrongful death action, was, in some respects, derivative of a decedent's personal injury claim, and thus, where certain defenses would bar a decedent's claim, they would similarly bar a wrongful death action brought by the decedent's surviving relatives. *Id*. at 222, 77 A.3d at 1057. We noted that the defenses which generally bar subsequent actions, such as contributory negligence, assumption of the risk, parental immunity, and lack of privity of contract, were distinguishable from the statute of limitations at issue, because where the former defenses applied, "the decedent did not have a viable claim from the *outset*." *Id*. 221, 77 A.3d at 1057 (emphasis added). We opined that the limitations defense barred an otherwise viable claim of the decedent, only due to a lapse of time, which made barring a wrongful death action under those grounds illogical since the action would be "time-barred before it can accrue." *Id*. at 226-28, 77 A.3d at 1060-61.

We also distinguished cases in which a wrongful death action was barred by a decedent's release of his negligence action. Citing with approval the holding in *State, ex rel. Melitch v. United Rys. & Electric Co. of Baltimore*, 121 Md. 457, 88 A. 229 (1913), we held that a release is distinguishable because "a decedent who executes a release has

- 6 -

acted affirmatively and purposefully to extinguish the underlying claim." *Mummert*, at 221-22, 77 A.3d at 1057. We reasoned that in a statute of limitations defense, "there may be no evidence necessarily that the decedent intended to allow the statute of limitations to run[.]" *Id*.

Petitioners, thereafter, relied on *Mummert* in their brief to the Court of Special Appeals, asserting that the narrow holding regarding the limitations defense, did not preclude their *res judicata* defense that Dylan's pursuit of a judgment during his lifetime extinguished Respondents' wrongful death action under the express provisions in the wrongful death statute. On November 21, 2013, the Court of Special Appeals directed the parties to file memoranda addressing the application of *Mummert*. In those filings, both parties disputed whether *Mummert* was dispositive of the matter before us.

### Court of Special Appeals Opinion[4]

In the unreported opinion filed on August 7, 2015, the Court of Special Appeals reversed the circuit court's judgment granting Petitioners' Motion to Dismiss Respondents' wrongful death action; remanded the case for further proceedings; and held that that Respondents' wrongful death action was not barred by a judgment in Dylan's personal injury action. *McQuitty v. Spangler*, No. 2375 Sept. Term 2012, 2015 WL 5822059 (Md.

---

[4] The issue on appeal, which the Court rephrased stated:

Under the principles enunciated in *Mummert v. Alizadeh*, 435 Md. 207 [,77 A.3d 1049] (2013), does a judgment in favor of a decedent in a personal injury action preclude a subsequent wrongful death claim brought by the decedent's survivors on the basis of the same conduct as the underlying personal injury action?

Ct. Spec. App. Aug. 7, 2015). The Court concluded that both parties overstated the impact of its holding on the circumstances presented. The Court reasoned:

> First, *Mummert* does not mandate a holding in favor of [Respondents]. The *Mummert* Court held that not *all* defenses to a decedent's personal injury claim would bar a subsequent wrongful death action, but did not hold that *every* such defense lost its preclusive effect. The only defense vis-a-vis the decedent's claim that *Mummert* expressly removed from the arsenal of the wrongful death defendant is the expiration of the limitations period in the decedent's personal injury claim. The Court restricted its holding to the facts before it, and made no specific comment on which other defenses, if any, may no longer preclude subsequent wrongful death actions.
>
> The fact that some defenses vis-a-vis a decedent's claim maintain their preclusive effect after *Mummert*, however, does not compel a holding for [Petitioners]. Instead, *Mummert* raises the following question relevant to the matter *sub judice*: Is a judgment in favor of the decedent in his personal injury action similar to the defenses that *Mummert* upheld, namely, defenses barring such personal injury action from the outset? In answering that question, we are unpersuaded by [Petitioners] analogy of a pre-existing judgment in favor of Dylan to the defenses upheld in *Mummert*, and conclude instead that the rationale expressed by the Court of Appeals in that case supports a holding in favor of [Respondents].

*McQuitty*, 2015 WL 5822059, at *7 (internal citations omitted) (emphasis in original).

On that premise, the Court also concluded that a successful judgment in favor of a decedent in a personal injury action was distinguishable from the defenses recognized in *Mummert*, as barring a subsequent wrongful death action. The Court stated:

> A judgment in Dylan's favor on his personal injury claim is not a bar to that claim—it is the ultimate validation of the claim. The preclusive effect of such judgment flows from the principles of *res judicata*. Here, *res judicata* does not bar [Respondents'] wrongful death action, because *res judicata* only applies to actions between the same plaintiffs and defendants.

*Id*. at *7-8. As a result, the Court rejected Petitioners' argument that Dylan's "affirmative and purposeful conduct" in pursuing a judgment against them barred Respondents'

wrongful death action, and reasoned that Dylan's pursuit of his claim was not a release or settlement. *See id*. The Court also disagreed with Petitioners contention that permitting the wrongful death action would result in double recovery. *See id*. at *8. The Court opined that the potential for overlapping damages should not "absolutely bar" subsequent wrongful death actions, because any overlap could be resolved on a case-by-case, damages-by-damages basis in the circuit court. *Id*. at *9. The Court, nonetheless, concluded that the risks associated with a double recovery did not exist in the case at bar:

> Although Dylan recovered damages for the loss of future earnings, [Respondents] cannot recover damages for those earnings in a wrongful death action, because '[p]arents may recover a pecuniary value for the loss of an employed deceased minor child's future earnings, at least to the date the deceased would have become an adult, had he/she lived.'

*Id*. at *10 (citations omitted). In support of this conclusion, the Court observed that Dylan was not employed at the time of his death, and that the only other damages recoverable by Respondents in their wrongful death action were solatium damages,[5] which were personal to them and not recoverable by Dylan. *See id*. We, thereafter, granted *certiorari*.

---

[5] Solatium damages are damages for "mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education." *See* Cts. & Jud. Proc. § 3-904(d); *Daley v. United Servs. Auto. Ass'n*, 312 Md. 550, 553 n.2, 541 A.2d 632, 633 n.2 (1988).

**STANDARD OF REVIEW**

When this Court reviews a circuit court's grant of a motion to dismiss, we "must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn [therefrom.]" *McHale v. DCW Dutchship Island, LLC*, 415 Md. 145, 155, 999 A.2d 969, 975 (2010) (quoting *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643, 994 A.2d 430, 433 (2010)). We analyze the circuit court's decision to determine whether it was legally correct, and "order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted." *McHale*, 415 Md. at 155, 999 A.2d at 975 (quoting *RRC Northeast*, 413 Md. at 643, 994 A.2d at 433).

**DISCUSSION**

I.   **Relevant provisions of Maryland's current wrongful death statute**

Maryland's wrongful death statute allows the maintenance of an action "against a person whose wrongful act causes the death of another." Cts. & Jud. Proc. § 3–902(a). "Wrongful act" is defined as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued." Cts. & Jud. Proc. § 3–901(e). The primary beneficiaries of a wrongful death action are the spouse, parent, and child of the decedent. Cts. & Jud. Proc. § 3–904(a)(1). However, relatives by blood or marriage who substantially relied upon the decedent, are also eligible claimants. Cts. & Jud. Proc. § 3-904(b). Where the decedent is a spouse, minor child, parent of a minor child, or an unmarried child that is not a minor,

the wrongful death statute provides damages for "pecuniary losses," if any, in addition to damages for "mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable. . . ." Cts. & Jud. Proc. § 3–904(c)-(d).

## II. Maryland's wrongful death statute creates a new and independent cause of action for a decedent's beneficiaries

The determinative issue in the case at bar is whether, under the definition of "wrongful act" in Cts. & Jud. Proc. § 3-901(e), a wrongful death action is derivative, or independent of, a decedent's prior personal injury claim, where the decedent obtained a judgment based on the same underlying facts. Thus, a resolution requires this Court to revisit the interpretation of the language contained in Cts. & Jud. Proc. § 3-901(e), which provides:

> 'Wrongful act' means an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued.

Petitioners argue that Respondents' wrongful death action is derivative of Dylan's personal injury action and therefore, barred by *res judicata*, since Dylan would not be entitled to a double recovery if death had not ensued. Conversely, Respondents allege that their wrongful death action is a new and independent cause of action, only subject to the condition that Dylan possessed a viable claim at the outset, and therefore, not subject to a *res judicata* defense.

- 11 -

We hold that the Maryland wrongful death statute provides a new and independent cause of action, which does not preclude a subsequent action brought by a decedent's beneficiaries, although the decedent obtained a personal injury judgment based essentially on the same underlying facts during his or her lifetime. The parties' arguments focus primarily on the definition of "wrongful act," specifically the phrase, "if death had not ensued." To discern the meaning of this phrase, we apply the long-standing canons of statutory interpretation.

"'The cardinal rule of statutory interpretation is to ascertain and effectuate the intent of the [General Assembly].'" *Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins, LLC*, 412 Md. 308, 314, 987 A.2d 48, 52 (2010) (citation omitted). "'Statutory construction begins with the plain language of the statute, and ordinary, popular understanding of the English language.'" *Id.* at 314-15, 987 A.2d at 52 (citations omitted). We, therefore, "'[n]either add nor delete language so as to reflect an intent not evidenced in the plain language of the statute; nor [do we] construe the statute with forced or subtle interpretations that limit or extend its application.'" *Id.* at 315, 987 A.2d at 52 (citations omitted).

Moreover, this Court "reads the statute as a whole to ensure that none of its provisions are rendered meaningless[,] and [ ] will not construe a statute to reach a result 'that is unreasonable, illogical, or inconsistent with common sense.'" *Id.* (citations omitted). "If the language of the statute is clear and unambiguous, we need look no further than the language of the statute to ascertain the [General Assembly's] intent." *Id.* (citation omitted). However, "[w]hen the language of the statute is subject to more than one

interpretation, it is ambiguous and we usually look beyond the statutory language to the statute's legislative history, prior case law, the statutory purpose, and the statutory structure as aids in ascertaining the [General Assembly's] intent." *Id*. (citations omitted). Under these circumstances, "we also consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Id*. at 315, 987 A.2d at 52-53 (internal quotations and citations omitted).

We also note an additional consideration that is relevant to the issues presented— that "[s]tatutes in derogation of the common law are strictly construed, and it is not to be presumed that the [General Assembly] by creating statutory assaults intended to make any alteration in the common law other than what has been specified and plainly pronounced." *Cosby v. Dep't of Human Res*., 425 Md. 629, 645, 42 A.3d 596, 606 (2012) (citations omitted).

### A. Interpreting Cts. & Jud. Proc. § 3-901(e) of the Maryland wrongful death statute

Without extensive discussion, we acknowledge here, as in *Mummert*, 435 Md. at 218, 77 A.3d at 1055, that when read within the context of the statutory scheme, the language of Cts. & Jud. Proc. § 3-901(e) is ambiguous because a plain reading of the statute could lead to more than one interpretation. *See, e.g.*, *Mummert*, 435 Md. at 218, 77 A.3d at 1055 (noting that the parties' "dueling interpretations" regarding the plain meaning of § 3-901(e), "serve quintessentially to highlight the ambiguity in the statute's language[]") (citing *Reier v. State Dep't of Assessments & Taxation*, 397 Md. 2, 26-27, 915 A.2d 970,

- 13 -

985 (2007)) ("It strikes us that the competing parties' argument present 'two . . . reasonable alternative interpretations of the statute,' making the statute ambiguous.") (citation omitted).

This ambiguity is reflected in the parties' arguments. Petitioner contends that the definition of a wrongful act, specifically as it pertains to the phrase "if death had not ensued[,]" leads to a conclusion that "a settlement and/or judgment in a personal injury matter in one's lifetime" bars subsequent pursuit of a wrongful death claim.

Respondents disagree, *see supra*, and on related grounds, aver that "[b]ecause Dylan had a viable claim from the outset," Petitioners' interpretation of the statute "would lead to illogical and absurd results." Specifically, Respondents assert that "if Dylan had died before the entry of judgment in his favor on September 29, 2006," their wrongful death action "could have proceeded without the bar of *res judicata*." In Respondents' view, an argument that "Dylan lived to see his personal injury claims vindicated by a jury forfeited [their] right to recover their own separate and distinct damages arising from his death[,]" leads to an outcome that is "entirely inconsistent with the purpose of the [w]rongful [d]eath statute." We, therefore, look beyond the statutory language of Cts. & Jud. Proc. § 3-901(e) to other sources in ascertaining legislative intent.

### i. Legislative History

In 1852, Maryland enacted the wrongful death statute to remedy the common law's unaccommodating treatment of a tort victim's family. *See Mummert*, 435 Md. at 214-15, 77 A.2d at 1053; *Walker v. Essex*, 318 Md. 516, 569 A.2d 645, 648 (1990). Previously, common law denied tort recovery for injury once the tort victim had died and any new and

- 14 -

independent cause of action by the victim's beneficiaries were not recognized. *Mummert*, 435 Md. at 214-15, 77 A.2d at 1053; W. Page Keaton, *Prosser and Keaton on Torts*, § 127, at 945 (5th ed. 1984). The Maryland statute adopted language strongly resembling England's Fatal Accidents Act, otherwise known as the Lord Campbell's Act,[6] which provided:

> [W]hensoever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect or default is such as would (if death had not ensued,) have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured. . .

1852 Md. Laws ch. 299; *see also* Richard J. Gilbert & Paul T. Gilbert, *Maryland Tort Law Handbook*, § 13.0 at 160 (3rd ed. 2000) ("Maryland followed the English lead with 1852

---

[6] The Lord Campbell's Act provided:

> [W]hensoever the Death of a Person shall be caused by wrongful Act, Neglect or Default, and the Act, Neglect, or Default is such as would (if Death had not ensued) have entitled the Party injured to maintain an Action and recover Damages in respect thereof, then and in every such Case the Person who would have been liable if Death had not ensued shall be liable to an Action for Damages, notwithstanding the Death of the Person injured.

*See* W. Page Keaton, *Prosser and Keaton on Torts*, § 127, at 954, n.6 (5th ed. 1984) (quoting 9 and 10 Victoria ch. 93 (1846)); Elizabeth Clark, *Impacts of Modern Life Support Techniques on Wrongful Death Actions Brought After Final Personal Injury Judgments*, 16 U. PUGET SOUND L. REV. 711, 715 (1993) (footnote and accompanying citation omitted). This remedy for a victim's relatives appeared in 1846, and created a new and independent cause of action limited to certain beneficiaries, by measuring damages by their loss. *Id*.; Richard J. Gilbert & Paul T. Gilbert, *Maryland Tort Law Handbook*, § 13.1 at 160 (3rd ed. 2000); *Prosser & Keaton*, § 127 at 947. Accordingly, the act represented the first legal recognition of the injuries experienced by beneficiaries, as well as their independent right of recovery resulting from a tort-feasor's conduct that led to a loved one's death. *Id*.

Maryland Laws, ch. 299, a virtual copy of the English Act."). Further iterations of the statute remained virtually unchanged for nearly a century.[7] *See Mummert*, 435 Md. at 215, n.4, 77 A.3d at 1054, n.4. In the 1970 Replacement Volume, *see* Md. Code (1957, 1970 Repl. Vol.), Article 67 § 1, language was added to the statute to address wrongful deaths caused by vessels, and cases where the tort-feasor was deceased. However, the language relevant to the case at bar remained unchanged.

In 1973, the General Assembly moved the statute from Article 67 to Title 3, Subtitle 9 of the Court and Judicial Proceedings Article. The 1973 iteration provided, in relevant part, that, "[a]n action may be maintained against a person whose wrongful act causes the death of another," defining the phrase "wrongful act" as "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued." *See* Cts. & Jud. Proc. §§ 3–901(e) and 3–902(a)). Other revisions were for organizational and stylistic purposes, which did not alter the meaning of the statute. *See Mummert*, 43 Md. at 216, 77 A.3d at 1054 (citing 1973 Md. Laws Spec. Session. 169, Revisor's Note; Williams H. Adkins, II, *Code Revision in Maryland: The Court and Judicial Proceedings Article*, 34 MD. L.REV. 7, 30 (1974)).

The most substantive revisions to the 1852 iteration of the statute involved enlarging the statutory limitations provisions from the original twelve months, to eighteen months, then to two years; and finally to the current three-year statutory period. *See* Cts. & Jud.

---

[7] Earlier versions of the statute appeared at Md. Code (1860), Article 65 § 1. The statute was later codified at Md. Code (1879), Article 67 § 1.

Proc. § 3-904(g)(1); *Mummert*, 435 Md. at 216; 77 A.3d at 1054 (citing *Waddell v. Kirkpatrick*, 331 Md. 53, 55-56 & n.4, 626 A.2d 353, 354-55 & n.4 (1993)).

As the foregoing reflects, there was no indication that subsequent revisions to the statute were intended to alter the meaning of the phrase "if death had not ensued." Additionally, we acknowledge that apart from this background, there is no legislative history indicating whether the phrase precludes beneficiaries from maintaining a wrongful death action when the decedent obtained a personal injury judgment based on the same, or similar, underlying facts during his or her lifetime.

### ii.    General Statutory Purpose

The wrongful death statute allows the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's negligence. *See* 1852 Md. Laws ch. 299; Cts. & Jud. Proc. §3-904(a)(1)-(b). *See also Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d 1097, 1102 (1997) (a wrongful death action allows "a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death.") (citing *United States v. Streidel*, 329 Md. 533, 620 A.2d 905 (1993)); *Mummert*, 435 Md. at 219, 77 A.3d at 1056 ("The purpose of the act was to compensate the families of the decedents, as opposed to the estates of the decedents[.]"); *Georgia-Pac. Corp. v. Benjamin*, 394 Md. 59, 79, 904 A.2d 511, 523 (2006) ("A wrongful death action is designed to compensate the family of a decedent who died due to the 'wrongful act, neglect, or default on another person.'") (footnotes and citations omitted).

Thus, Maryland has historically adhered to the minority view[8] that the wrongful death statute created a new and independent cause of action, distinguishable from a decedent's own personal injury action during his or her lifetime, or a survival action.[9] In *Stewart v. United Elec. Light & Power Co.*, 104 Md. 332, 65 A. 49, 53 (1906), this Court explained:

> It is the settled law of Maryland that the act of 1852 created a new cause of action. In *[Tucker v. State, Use of Johnson]*, 89 Md. 479, 43 Atl. 778, 44 Atl. 1004, 46 L. R. A. 181, this [C]ourt, in speaking of that statute, said: 'By it the jury may give such damages as they may think proportioned to the injury resulting from such death, and not such as the injured person could have recovered if he has survived. The injury for which the equitable plaintiffs are compensated is the pecuniary loss sustained by reason of the death of the person through the wrongful act, neglect, or default of the defendant. The statute, therefore, properly speaking, was not passed, as is sometimes said of it, to remove the operation of the common-law maxim,

---

[8] The Restatement (Second) of Judgments § 46 cmt. b (1982) distinguished the majority and minority views as follows:

> If the claim for wrongful death is treated as wholly 'derivative,' the beneficiaries of the death action can sue only if the decedent would still be in a position to sue. . . . Accordingly, settlement of the decedent's personal injury claim or its reduction to judgment for or against the alleged tort[-]feasor extinguishes the wrongful death claim against that tort[-]feasor. Similarly, issue preclusion applicable against the decedent is applicable also against the claimant in the wrongful death action.

> If, on the other hand, the claim for wrongful death is treated as wholly 'independent,' the decedent's disposition of his personal injury claim would have no effect on the wrongful death claim. The situation would be as though the injured person and his beneficiaries each had a separate legal interest in his life, assertable by separate action.

*See also Prosser & Keaton*, § 127 at 955-56.

[9] A survival action is defined as "an action for the recovery of damages for injury to a fatally injured person that is brought by his or her personal representative[.]" Merriam-Webster's Collegiate Dictionary, Eleventh Edition.

- 18 -

'Actio personalis moritur cum persona,' as it has not undertaken to keep alive an action which would otherwise die with the person, but, on the contrary, has created a new cause of action for something for which the deceased person never had, and never could have had, the right to sue; that is to say, the injury resulting from his death.' This view is sustained by the great weight of the English cases which arose under Lord Campbell's act; and that act from which ours was copied preceded the adoption of ours but six years.

While Petitioners acknowledge that a wrongful death claim is an independent cause of action, they nonetheless, aver that the claim is simultaneously "conditioned upon the decedent's ability to maintain a claim," had death not ensued. Petitioners emphasize this Court's analysis in *Stewart, supra* and *Melitch*, 121 Md. 457, 88 A. 229, as support for the dismissal of Respondents' wrongful death action. However, Petitioners' reliance on these cases is misplaced.

In *Stewart*, this Court addressed whether a decedent's survival action resulting from the defendants' negligence survived after the decedent's death. 104 Md. 332, 65 A. at 50. Petitioners aver that while this Court recognized in *Stewart* that wrongful death actions and survival actions were independent and could be maintained simultaneously upon the death of the decedent, which excluded settlements obtained by the decedent during his lifetime, *see* 104 Md. 332, 65 A. at 54; this Court's statement that a wrongful death action was permissible only "under certain conditions," *see* 104 Md. 332, 65 A. at 50, includes compliance with the definition of "wrongful act." We are not persuaded.

Petitioners overstate this Court's observation that a wrongful death action was permissible only "under certain conditions[]" to mean compliance with the phrase "if death had not ensued." In its full context, this Court stated that the wrongful death statute provided a right of action "under certain conditions to designated relatives of a deceased

- 19 -

person, but not to his personal representatives, when death has been caused by a wrongful act or by negligence." 104 Md. 332, 65 A. at 50. In our view, this conclusion was limited to an acknowledgment that the wrongful death statute confers a right of action to a decedent's beneficiaries, not a decedent's personal representatives, as contemplated in a survival action.

Similarly, in *Melitch*, the issue before the Court was whether the decedent's release of liability in a personal injury action during his lifetime, constituted a bar to recovery in a subsequent wrongful death action brought by his wife. 121 Md. 457, 88 A. 229. This Court ultimately held that the release barred future recovery. *Id*. (holding that Melitch "by deed, for a valuable consideration, released the defendant from all and every claim and demand which he might or could possibly have for or on account of his injuries.").

After examining several cases from other jurisdictions that construed the meaning of similar wrongful death statutes, 121 Md. 457, 88 A. at 229-30, this Court interpreted the Maryland statute to mean "that liability of the wrongdoer exists where the deceased could have recovered if death had not ensued[]" which "clearly exclude[d] the idea that where the decedent receives satisfaction for his injuries, the condition requisite to the right of surviving relatives may exist notwithstanding." 121 Md. 457, 88 A. at 230.

Although acknowledging a wrongful death action as an independent claim, this Court considered a decedent's release, settlement, *or* prior judgment in a personal injury action, within the scope of statutory language, and barred a subsequent wrongful death action. 121 Md. 457, 88 A. 229, 230-31. *See also* 121 Md. 457, 88 A. at 231 (acknowledging the "settled rule of law of Maryland to be that the Act of 1852 created a

- 20 -

*new* cause of action," but also "that the right of the relatives named in the statute to recover 'is contingent upon the death of the injured person without having his claim for damages satisfied.'"). However, we observe that the *Melitch* holding, as it pertains to the effect of a prior judgment in a decedent's personal injury action, is contrary to longstanding Maryland law that a subsequent wrongful death action brought by a decedent's beneficiaries is not barred by the disposition of a decedent's personal injury claim. *See Mummert*, 435 Md. at 219-20, 77 A.3d at 1056; Restatement (Second) of Judgments § 46 cmt. b; *Stewart*, 104 Md. 332, 65 A. 49, 53.

Moreover, because the existence of a prior personal judgment was not dispositive of the issue before the Court in *Melitch*, Petitioners essentially rely upon dicta,[10] to support their argument that a final judgment in a decedent's personal injury claim defeats a subsequent wrongful death action. Accordingly, while we do not overrule *Melitch*, we acknowledge that the Court's opinion in that regard is distinguishable from circumstances before us, and does not sustain Petitioners' argument.

We are similarly not persuaded by Petitioners' argument that Dylan's "[a]ffirmative and [p]urposeful [c]onduct" in pursuing a personal injury action during his lifetime, bars Respondents' wrongful death claim. Specifically, Petitioners allege that "Dylan's affirmative and purposeful conduct in successfully [pursuing] a $13 million dollar verdict operates to extinguish Respondents' wrongful death claims now." In reliance on the out-

---

[10] "Dicta" is defined as "a judge's expression of opinion on a point other than the precise issue involved in determining a case[.]" Merriam-Webster's Collegiate Dictionary, Eleventh Edition.

of-state cases cited by this Court in *Melitch*, Petitioners ask that we analogize a decedent's prior release or settlement of a personal injury action, with a decedent's judgment obtained after a full adjudication of the merits. We decline to adopt Petitioners' reasoning, since it is contrary to this Court's view that the wrongful death statute creates a new and independent cause of action for a decedent's beneficiaries that is not barred by a judgment in a decedent's personal injury action during his or her lifetime on the same underlying facts.

Petitioners also rely upon *Eagan*, 347 Md. at 82, 698 A.2d at 1102, *Bushey v. Northern Assur. Co. of America*, 362 Md. 626, 766 A.2d 598 (2001); *Woolridge v. Price*, 184 Md. App. 451, 966 A.2d 955 (2009); and *Mummert*, 435 Md. at 222, 77 A.3d at 1058, and assert that "longstanding jurisprudence in this State confirms that while a wrongful death action is a separate and distinct cause of action, it still must satisfy the statutory precondition that the [decedent] be able to maintain an action and [recover] damages if death had not ensued." Specifically, Petitioners aver:

> Given that Dylan [ ] had obtained a judgment against Dr. Spangler for lack of informed consent on September 27, 2006, principles of *res judicata* would preclude him from maintaining a second action for the same alleged misconduct against Dr. Spangler if death had not ensued. As a result, there is no viable wrongful death action under Maryland's wrongful death statute.

We disagree. As an initial matter, the cases cited by Petitioners do not support their interpretation of Cts. & Jud. Proc. § 3-901(e). Our reasoning in *Eagan*, is inapplicable to the case at bar. The issue there was whether a wrongful death action brought by the deceased mother's children, against the tort-feasor (the children's father) was barred under the doctrine of parental immunity. 347 Md. at 74, 81-82, 698 A.2d at 1098, 1102. Although

- 22 -

we acknowledged that a wrongful death claimant "is ordinarily subject to any defense that is applicable to him or her, whether or not it would have been applicable to the decedent," we also observed that a wrongful death action was a new and independent cause of action, stating:

> While certainly based on the death of another person, it is not brought in a derivative or representative capacity to recover for a loss or injury suffered by that person but, rather, is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death.

*Id*. at 82, 698 A.2d at 1102. *See also Mummert*, 435 Md. at 220, 77 A.3d at 1056 (noting that *Eagan* "serves actually to highlight the distinction between the decedent's claim and a subsequent wrongful death claim[]"). On unrelated grounds, we nonetheless held that the doctrine did not bar a wrongful death action filed on behalf of an unemancipated minor against a parent when the matter is based on the murder or voluntary manslaughter by that parent of the child's other parent. *Eagan*, 347 Md. at 74, 698 A.2d at 1098.

The reasoning in *Bushey* was similarly limited in scope. In that case, we addressed in relevant part, whether the parental immunity doctrine barred the parents' claim against the estate of one of their deceased daughters. 362 Md. 626, 629, 644, 766 A.2d 598, 599, 607-08 (2001). In the underlying matter, the parents sued the estate of the deceased daughter, whose negligence resulted in a fatal car accident causing the death of both daughters. *Id*. Although, as Petitioners acknowledge, we discussed the definition of "wrongful act" under Cts. & Jud. Proc. § 3-901(e), and observed that courts must examine the relationship between the decedent and tort-feasor to determine the sustainability of a tort action, that was the extent of the reference. *See id*. at 646, 766 A.2d at 608-09.

- 23 -

Ultimately, our holding was predicated on the facts of the case and the application of the parental immunity doctrine. *See generally id*. Petitioners' reliance on the Court of Special Appeals' analysis in *Wooldridge*, is also attenuated, given that the Court addressed in relevant part, whether the contributory negligence of the decedent barred a wrongful death beneficiary's subsequent wrongful death and survival action. 184 Md. App. 451, 454, 966 A.2d 955, 957 (2009). Contributory negligence on the part of Dylan or Respondents is not at issue here.

Additionally, although in *Mummert*, this Court observed the derivative nature of a beneficiary's subsequent wrongful death action vis-à-vis a decedent's personal injury claim, we ultimately upheld the long-standing principle in Maryland that a wrongful death claim is a new and independent cause of action. We explained:

> It is not wholly incorrect to state that a wrongful death claim is derivative of the decedent's claim in some sense. The two actions stem from the same underlying conduct, which must have resulted in the decedent having a viable claim when she was injured. *That connection, however, does not compel the conclusion that all defenses applicable to the decedent's claim prior to her death would preclude necessarily maintenance of a wrongful death claim after the decedent's death.* That the [General Assembly's] purpose was to create a new and independent cause of action when it passed the wrongful death statute suggests that it did not intend for a statute of limitations defense against the decedent's claim to bar consequently a subsequent wrongful death claim. . . .
>
> Because we have long held that Maryland's wrongful death statute created a new and independent cause of action, we are inclined to find more persuasive the reasoning of those other courts' cases holding that a wrongful death claim is not contingent on the decedent's ability to bring a timely claim before death.

435 Md. 207, 222, 226, 77 A.3d 1049, 1058, 1060 (emphasis added); *see also id.* at 228, 77 A.3d at 1061 (acknowledging the "[General Assembly's] purpose of creating a new and

- 24 -

independent cause of action when it passed the Maryland wrongful death statute[.]"). Although we acknowledge the narrow holding of *Mummert* regarding a statute of limitations defense to a wrongful death action, *Mummert* is consistent with long-standing Maryland wrongful death jurisprudence, and remains authoritative.

Adopting Petitioners' interpretation of Cts. & Jud. Proc. § 3-901(e) would require this Court to ignore long-standing Maryland law. Although Dylan's judgment obtained against Dr. Spangler in his personal injury action would preclude *him* from maintaining a second action based on the same underlying conduct, under principles of *res judicata*, this reasoning is not applicable to a subsequent wrongful death action by Respondents. *See, e.g.*, *Binnix v. Johns-Manville Products Corp*., 593 F. Supp. 1180, 1182 (D. Md. 1984) (a wrongful death action "is a new cause of action and consequently one which the decedent never had[.]") (quoting *Stewart*, 104 Md. at 340, 65 A. at 52).

### iii. Caselaw supporting majority and minority views of similar wrongful death statutes

As noted *supra*, there is a split of authority regarding whether a decedent's personal injury action is derivative or independent of a subsequent wrongful death action by the decedent's beneficiaries. A majority of jurisdictions have held that a wrongful death action is derivative of a decedent's personal injury action, and thus, a judgment in favor of the decedent, or a release of liability prior to the decedent's death, bars a subsequent action. *See, e.g.*, *Varelis v. Nw. Mem'l Hosp*., 657 N.E.2d 997, 1000 (Ill. 1995) (wrongful death action is "derivative of the decedent's rights, for the ability to bring the wrongful death action 'depends upon the condition that the deceased, at the time of his death, had he

- 25 -

continued to live, would have had a right of action against the same person or persons for the injuries sustained.'"); *accord, Taylor v. Norfolk S. Ry. Co.*, 86 F. Supp. 3d 448, 454-55 (M.D.N.C. 2015); *Union Bank of California v. Copeland Lumbar Yards, Inc.*, 160 P.3d 1032, 1035-37 (Or. 2007); *Doe v. State*, 189 A.D.2d 199, 206-07 (N.Y. App. Div. 1993); *Schoenrock v. Cigna Health Plan of Arizona, Inc.*, 715 P.2d 1236, 1237-39 (Ariz. Ct. App. 1985); *Hall v. Knudsen*, 535 A.2d 772, 773-75 (R.I. 1988); *Variety Children's Hosp. v. Perkins*, 445 So. 2d 1010, 1011-12 (Fla. 1983).

Conversely, a minority of jurisdictions have held that neither a judgment in favor of the decedent, nor a release of liability prior to the decedent's death, bars a subsequent wrongful death action. *See, e.g., Castorena v. Gen. Elec.*, 238 P.3d 209, 216 (Idaho 2010) ("Idaho's wrongful death action does not create a survival action, but an entirely new cause of action on behalf of a decedent's heirs and personal representatives."); *Thompson v. Wing*, 637 N.E.2d 917, 922 (Ohio 1994) ("Because a wrongful death action is an independent cause of action, the right to bring the action cannot depend on the existence of a separate cause of action held by the injured person immediately before his or her death. To conclude otherwise would convert the wrongful death action from an independent cause of action to a derivative action, one dependent on a separate cause of action."); *Blackwell v. Am. Film Co.*, 209 P. 999, 1001 (Cal. 1922) (holding that the decedent's recovery of damages for his injuries would not, in and of itself, prevent a recovery by beneficiary, because this view overlooks the fact that the beneficiary is suing, to recover as an heir or personal representative losses resulting from the decedent's death, and not to recover damages for the injuries and consequent suffering and loss to the

decedent); *accord, Gershon, Adm'x Ad Prosequendum for Estate of Pietroluongo v. Regency Diving Ctr., Inc.*, 368 N.J. Super. 237, 246, 845 A.2d 720, 726 (App. Div. 2004); *Winding River Vill. Condo. Ass'n, Inc. v. Barnett*, 459 S.E.2d 569, 571 (Ga. Ct. App. 1995); *Rowe v. Richards*, 151 N.W. 1001, 1003 (S.D. 1915).

In our view, the minority position aligns with the purpose of the wrongful death statute and Maryland's long-standing jurisprudence, which was established in *Stewart*, 104 Md. 332, 65 A. at 53.

### iv.   Consequences of interpreting a wrongful death action under § 3-901(e) as a derivative action

Similarly, interpreting a wrongful death action under Cts. & Jud. Proc. § 3-901(e) as derivative of a decedent's personal injury claim would also lead to a result that is inconsistent with the purpose of the statute. As noted *supra*, the purpose of the wrongful death statute is to allow the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's negligence. *See* Cts. & Jud. Proc. § 3-904(a)(1)-(d).

The Superior Court of New Jersey's assessment of the purpose of its wrongful death statute[11] in *Gershon*, 845 A.2d 720, 725-26, *supra*, is instructive. Although the wrongful death action at issue hinged upon the decedent's exculpatory release prior to his death, in emphasizing the remedial nature of the statute, the court stated:

> [T]he Wrongful Death Act is remedial legislation and must be liberally construed to effectuate its purpose of creating a right of recovery for the economic loss caused by the death of a family member. The class of litigants

---

[11] *See* N.J.S.A. 2A:31-1 through N.J.S.A. 2A:31-6.

- 27 -

in a wrongful death case often includes minor children, dependent upon the decedent for economic support. . . .

The emphasized language limiting the right to bring a wrongful death claim only in situations in which the decedent, had he or she lived, would have been entitled to bring an action for damages, pertains only to the character of the injury, and is not intended as a procedural or jurisdictional requirement. . . .

A wrongful death action can only be brought for the benefit of decedent's heirs. *N.J.S.A.* 2A:31–4. The action is commenced by either an administrator ad prosequendum of the decedent or an executor, if the decedent dies testate. *N.J.S.A.* 2A:31–2. As a matter of law, a wrongful death action does not accrue to the decedent.

Thus, although actions brought under the Survivor Act and the Wrongful Death Act arise from the death of the decedent, 'they serve different purposes and are designed to provide a remedy to different parties.' Wrongful death damages are intended to compensate the statutorily recognized class of claimants for the pecuniary losses caused by the death of the decedent as a result of the tortious conduct of others. . . .

*Id.* (case citations omitted). The Supreme Court of Ohio in *Thompson*, adhered to a similar line of reasoning. In holding that the decedent's recovery in a personal injury action did not bar a subsequent wrongful death action by his beneficiaries, the court reasoned:

Because a wrongful death action is an independent cause of action, the right to bring the action cannot depend on the existence of a separate cause of action held by the injured person immediately before his or her death. To conclude otherwise would convert the wrongful death action from an independent cause of action to a derivative action, one dependent on a separate cause of action. Moreover, the wrongful death action does not even arise until the death of the injured person. It follows, therefore, that the injured person cannot defeat the beneficiaries' right to have a wrongful death action brought on their behalf because the action has not yet arisen during the injured person's lifetime. Injured persons may release their own claims; they cannot, however, release claims that are not yet in existence and that accrue in favor of persons other than themselves.

*Thompson*, 637 N.E.2d at 922.

- 28 -

We agree with the *Gershon* court's reasoning that the phrase "if death had not ensued" pertains only to the character of the injury, and was not intended to be a procedural or jurisdictional prerequisite to a subsequent wrongful death action. A contrary interpretation would effectively negate the statute's purpose to compensate eligible beneficiaries for the pecuniary, and related losses, caused by the death of the decedent resulting from the tortious conduct of others. Additionally, as observed in *Thompson*, because a wrongful death action is operative only after the injured party's death for the benefit of the surviving beneficiaries, it is unreasonable to read the statutory language as allowing a decedent's personal injury action to essentially "defeat" the beneficiaries' right to pursue a wrongful death action on their behalf, when the right to claim has not been triggered.

It is difficult to reconcile Petitioners' interpretation of § 3-901(e). In our view, the General Assembly did not intend to bar a wrongful death action simply because a decedent pursued a personal injury action during his or her lifetime, since that interpretation would contravene the independent nature and purpose of a wrongful death claim.

## B. Defenses to a wrongful death action

### i. *Res Judicata* defense

We recognize the potential *res judicata* implications of our holding, particularly because wrongful death actions are often based upon essentially the same underlying facts of a decedent's personal injury action. For these same reasons, there is a dispute regarding the application of *res judicata* principles to the case at bar. Petitioners aver that *res judicata* is pivotal "given that Dylan is precluded form maintaining a second action against Dr.

- 29 -

Spangler . . ." under the doctrine, "which, in turn, bars Respondents from bringing a wrongful death claim . . ." under the express language of the wrongful death statute. Respondents disagree, and assert that the formulation of the wrongful death statute "moots the issue of the character of Dylan's judgment at the time of his death" because "the test of whether a 'wrongful act' existed . . . begins and ends with whether Dylan had a viable claim from the outset[.]" We agree.

The doctrine of *res judicata* consists of three elements: "(1) the parties in the present litigation are the same or in privity with the parties to the earlier litigation; (2) the claim presented in the current action is identical to that determined or that which could have been raised and determined in the prior litigation; and (3) there was a final judgment on the merits in the prior litigation.'" *Cochran v. Griffith Energy Servs., Inc*., 426 Md. 134, 140, 43 A.3d 999, 1002 (2012) (citations omitted). Thus, the doctrine "bars the relitigation of a claim if there is a final judgment in a previous litigation where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation." *Id*. (citations omitted).

On its face, the doctrine of *res judicata* appears applicable to the circumstances presented in the case at bar. First, the parties in the present litigation, Petitioners and Respondents, are the same, and Respondents are also in privity with Dylan, as the parents and representatives of the Estate in Dylan's personal injury action. Secondly, the claim presented in Dylan's personal injury action regarding the lack of informed consent, was also raised in Respondents' wrongful death action. Finally, there was a final judgment

- 30 -

regarding the merits in Dylan's personal injury action on September 27, 2006.[12]  However, as we explained in *Mummert*, 435 Md. at 220-21, 77 A.3d at 1057, a *res judicata* defense is not relevant to a wrongful death action because the test of whether the action is barred depends only upon whether the decedent had a viable claim at the outset of the litigation.

Specifically, we observed that Maryland recognized only certain defenses, which barred a decedent's personal injury claim, and in turn, precluded a wrongful death action by a decedent's beneficiaries. *Id*.  These defenses included contributory negligence, *see, e.g., Frazee v. Balt. Gas & Elec. Co*., 255 Md. 627, 258 A.2d 425 (1969); assumption of the risk, *see, e.g., Balt. & Potomac R.R. v. State ex rel. Abbott*, 75 Md. 152, 23 A. 310 (1892); parental immunity, *see, e.g., Smith v. Gross*, 319 Md. 138, 571 A.2d 1219 (1990); and a lack of privity of contract between a decedent and a manufacturer, *see, e.g., State ex rel. Bond v. Consol. Gas, Elec. Light & Power Co*., 146 Md. 390, 126 A. 105 (1924).  We further observed that the statute of limitations defense at issue in the case, was

---

[12] Respondents alternatively alleged that a *res judicata* defense was not applicable because "Dylan never possessed a final, enforceable judgment in his favor during his lifetime[.]"  Specifically, Respondents aver that Petitioners filed post-trial motions seeking JNOV and remittitur, and the latter motion was not decided until after this Court's decision in *McQuitty I*, which was after Dylan's death.  Respondents further allege that because Petitioners moved to vacate, amend or revise the judgment after the case was on remand, the circuit court was able to reduce the judgment in accordance with the Maryland cap on non-economic damages and the joint tort-feasor settlement only after that time.  At that point, Respondents aver that the judgment in favor of Dylan's Estate became a final and appealable judgment.  Petitioners counter that Respondents suddenly take a position regarding the date of final judgment, which the record reveals is inconsistent with the position they maintained throughout the litigation, and with this Court's own recognition of the date of final judgment.  We agree, and without extensive discussion, conclude that Respondents argument is unpersuasive, in light of our opinion in *McQuitty II*, in which we acknowledged that the final date of judgment was September 27, 2006.

distinguishable from the commonly-recognized defenses, because where the latter defenses applied, "the decedent did not have a viable claim at the outset." *Mummert*, 435 Md. at 221, 77 A.3d at 1057.

Thus, similar to a statute of limitations defense, *res judicata* is distinguishable from other defenses that bar a subsequent wrongful death action because a *res judicata* defense demonstrates the existence of a viable claim at the outset. Accordingly, because it is undisputed that Dylan possessed a viable claim against Petitioners from the outset of his personal injury action, any potential *res judicata* defense fails. *See also* Restatement (Second) of Judgments § 46 cmt. b, *supra* (recognizing that in jurisdictions where "the claim for wrongful death is treated as wholly 'independent,' [as in Maryland,] the decedent's disposition of his personal injury claim would have no effect on the wrongful death claim.").

Furthermore, we acknowledge that in addition to having a viable claim at the outset, the only conditions precedent to bringing a wrongful death action include: 1) that death ensued as a result of a wrongful act by a tort-feasor(s), *see* Cts. & Jud. Proc. §3-901(e), §3-902(a); 2) that the beneficiaries have standing to sue, *see* Cts. & Jud. Proc. §3-904(a)(1)-(b); and 3) that the action is within the statutory limitations period, *see* Cts. & Jud. Proc. 3-904(g).

## ii. Risk of Double Recovery

The parties also dispute the risk of double recovery, which was, in substantial part, the basis of Petitioners' Motion to Dismiss Respondents' wrongful death action.[13] However, because the damages recovered in a wrongful death action compensate for losses incurred by a decedent's beneficiaries *only after* death ensued, and are distinguishable from damages recovered by a decedent in a personal injury action, we hold that double recovery is *generally* not at risk. Cts. & Jud. Proc. § 3-904 provides in relevant part:

**Damages awarded in proportion to resulting injury**

(c)(1) In an action under this subtitle, damages may be awarded to the beneficiaries proportioned to the injury resulting from the wrongful death.
(2) Subject to § 11-108(d)(2) of this article, the amount recovered shall be divided among the beneficiaries in shares directed by the verdict.

**Death of spouse, minor child, parent of minor child, or unmarried children**

(d) The damages awarded under subsection (c) of this section are not limited or restricted by the "pecuniary loss" or "pecuniary benefit" rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable for the death of:
(1) A spouse;
(2) A minor child;
(3) A parent of a minor child; or
(4) An unmarried child who is not a minor child if:

---

[13] During oral argument, counsel for Respondents conceded that "there is some overlap," in damages, given that an award in Dylan's personal injury action and Respondents' wrongful death action, both include non-economic damages. Nonetheless, counsel alleged that the implications of a potential overlap were not relevant in the instant case, because the narrow issue before the Court concerned whether a wrongful death action is a new and independent cause of action. We agree, and in further consideration of this Court's limited scope of review, *see* Md. Rule 8-131(c), we shall not engage in an assessment regarding the allocation of those damages.

(i) The child is 21 years old or younger; or
(ii) A parent contributed 50 percent or more of the child's support within the 12-month period immediately before the date of death of the child.

* * *

The damages awarded to a decedent's beneficiaries are apportioned according to the harm resulting from a wrongful death. Cts. & Jud. Proc. § 3-904(c)(1).  The damages awarded are limited to pecuniary losses and solatium damages, which are not awarded in a personal injury action, but are personal to a decedent's beneficiaries and relatives after death has ensued. Cts. & Jud. Proc. § 3-904(d).

Based on this premise, states adhering to the minority view have held that an overlap in damages could not legally arise, given that the type of damages in a personal injury action and a wrongful death action, co-exist for independent reasons. *See Stewart*, 104 Md. at 332, 65 A. at 52 ("Under the [Lord Campbell's Act] the damages recoverable are such as the equitable plaintiffs have sustained *by the death* of the party injured.") (emphasis added); *see, e.g.*, *DeHart v. Ohio Fuel Gas Co.*, 85 N.E.2d 586, 589 (Ohio Ct. App. 1948) ("The rights of the next of kin begin where those of the injured person end, and are rights over which he could have no control."); *accord*, *Blackwell v. Am. Film Co.*, 209 P. at 1001).

Moreover, to the extent that there is a risk of double recovery, we agree with the Court of Special Appeals that the problem can be resolved by assessing the damages awarded in a personal injury and subsequent wrongful death action on a case-by-case basis at the trial level to ensure proper allocation. *See Mcquitty*, 2015 WL 5822059, at *9. Alternatively, although beyond the point of consideration in the case at bar, duplicative damages can also be avoided by consolidating the actions and bringing both claims

- 34 -

simultaneously. *See Prosser & Keaton*, § 127 at 958 (noting that some "statutes may require consolidation of the two actions" to avoid any potential risk of double recovery).

### C. Public policy considerations

Petitioners, with the support of Amici Curiae,[14] raise several public policy arguments. Specifically, Petitioners assert that affirming the Court of Special Appeals' judgment would result in an influx of lawsuits, the value of current personal injury cases would increase and make settlement more difficult; there would be a potential for duplicative damages; and finally, the intermediate appellate court's judgment effectually "usurp[s] the power of the [General Assembly]."

Beyond Petitioners' contention that the Court of Special Appeals' judgment would cause an increase in lawsuits and the current value of personal injury cases, these assertions have not been substantiated with any credible evidence. Additionally, as concluded *supra*, a risk of double recovery is generally not likely, given the distinct purpose of damages in both actions. Nonetheless, to the extent that duplicative damages exist in the case at bar, the circuit court should assess and properly allocate such damages on remand. *See McQuitty*, 2015 WL 5822059, at *9.

---

[14] Medical Mutual Liability Insurance Society of Maryland, an insurer of physicians against malpractice liability in Maryland; MedChi, the Maryland State Medical Society, a professional association of Maryland physicians; the American Insurance Association, a national trade association that represents major property and casualty insurance companies; and PIAA, an insurance industry trade association that represents a range of entities doing business in the medical profession liability arena, submitted Amici Curiae in support of Petitioners. In sum, these entities asserted that the Court of Special Appeals misinterpreted *Mummert* and its antecedents, and that its ruling would adversely impact medical malpractice claims costs and subsequent premium costs, under similar public policy arguments raised by Petitioners.

- 35 -

Moreover, Petitioners' contention that the Court of Special Appeals' judgment "usurps" legislative powers is also unavailing. Contrary to Petitioners' assertion, the Court did not "engage[ ] in a rewriting" of the wrongful death statute, by "effectively erasing the 'if death had not ensued' provision." Rather, the Court simply adhered to the long-standing tradition in Maryland that the wrongful death statute created a new and independent cause of action for a decedent's beneficiaries. We do not characterize the Court's deference in this regard as overstepping its judicial function, but instead, consider its judgment to be in furtherance of its function in interpreting the law and legislative intent that is consistent with the statutory scheme and Maryland wrongful death jurisprudence.

## III. The Elberfeld release does not bar Respondents' wrongful death action[15]

Because the release was a covenant between Dylan and Dr. Elberfeld, and the language of the release unambiguously revealed an intent to release only Dr. Elberfeld, the release does not preclude Respondents' wrongful death action against Petitioners.

Petitioners assert that if this Court rules that Dylan's personal injury action did not bar Respondents' wrongful death action, Respondents, are nonetheless, barred by the Elberfeld release executed between Dylan, and former co-defendant, Dr. Elberfeld. Petitioners allege that the covenant not to sue in paragraph eight of the Elberfeld release

---

[15] Although we also observe that the issue regarding the applicability of the Elberfeld release was not preserved for appellate review, we exercise our discretion pursuant to Md. Rule 8-131(a) to address the matter. *See id.* (stating in relevant part, "[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the [circuit] court, but the Court may decide such an issue if necessary or desirable to guide the [circuit] court or to avoid the expense and delay of another appeal.").

was not limited to a future claim against Dr. Elberfeld, but "rather, . . . was an attestation that Respondents 'will not maintain *any* potential action for wrongful death.'" (emphasis in original). Accordingly, Petitioners aver that because the Elberfeld release "extinguished *all* future claims of wrongful death beneficiaries, known and unknown," the holding in *Melitch*, where decedent's settlement of his claim during his lifetime barred a subsequent wrongful death action, applies, and similarly bars Respondents' wrongful death action. (emphasis in original).

We disagree. Historically at common law, release of one joint tort-feasor operated as a release of all joint tort-feasors.[16] *See Morgan v. Cohen*, 309 Md. 304, 315-16, 523 A.2d 1003, 1008 (1987); *Swigert v. Welk*, 213 Md. 613, 619, 133 A.2d 428, 431 (1957). However, the Maryland version of the Uniform Contribution Among Tort-Feasors Act altered the common law so that a release of one joint tort-feasor, did not discharge all. *See* Cts. & Jud. Proc. § 3-1404; *Morgan*, 309 Md. at 315-16, 523 A.2d at 1008; *Martinez v. Lopez*, 300 Md. 91, 102, 476 A.2d 197, 202 (1984); *Swigert*, 213 Md. at 619, 133 A.2d at 431. Specifically, Cts. & Jud. Proc. § 3-1404 provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors *unless the release so provides*, but it reduces the claim against the other tort-feasors in the amount of the consideration paid for the release or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

(emphasis added).

---

[16] Cts. & Jud. Proc. § 3-1401(c) provides that "'[j]oint tort-feasors'" means two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."

In construing the meaning of a release, this Court adheres to principles of contract interpretation. *See Hashmi v. Bennett*, 416 Md. 707, 723, 7 A.3d 1059, 1068 (2010); *Owens-Illinois, Inc. v. Cook*, 386 Md. 468, 495, 872 A.2d 969, 985 (2005). Therefore, "[a] release is to be construed according to the intent of the parties[,] the object and purpose of the instrument, [which] will control and limit its operation." *Id*. at 496, 872 A.2d at 985. Maryland also follows the objective law of contract interpretation and construction. *Id*.; *Calomiris v. Woods*, 353 Md. 425, 435, 727 A.2d 358, 363 (1999). We explained this principle in *Owens-Illinois*, 386 Md. at 496, 872 A.2d at 985, as follows:

> A court construing an agreement . . . must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated. In addition, when the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed. In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. Consequently, the clear and unambiguous language of an agreement will not give away [ ] to what the parties thought that the agreement meant or intended it to mean. . . .

(quotations and citations omitted).

Petitioners' argument that the Elberfeld release applied to all tort-feasors, rests upon an isolated reading of the release. A plain reading of the preface of the release, in tandem with paragraphs three, seven, and eight of the release, unambiguously reveals that Dylan did not "release or in any way discharge" Petitioners from further claims in connection with the underlying action. The relevant provisions states the following:

> For and in consideration of the sum of ($999,000) the receipt and sufficiency of which is hereby acknowledged, for ourselves and our heirs, representatives, executors, administrators, successors and assigns, we, Peggy

McQuitty and Gary McQuitty, individually, and as parents and next friends of the minor Plaintiff, Dylan McQuitty (hereinafter Plaintiff) do hereby remise, release and forever discharge Harold Elberfeld, M.D., and his personal agents, servants and/or employees, only, (hereinafter Defendant), his predecessors and/or successors in interest, and his insurance company Zurich American (Zurich) (hereinafter referred to collectively as "Releasees") and, subject to the terms of paragraph #3, any other persons or entities for whom Releasees could be legally responsible, as applicable, whether or not named herein, of and from all, and all manner of, actions and causes of actions, suits, debts; accounts, bonds, covenants, contracts, agreements, judgments, claims and demands of whatsoever kind, in law or in equity, known or unknown, foreseen and unforeseen, which we now have or may hereafter have, arising out of an incident and management of a pregnancy and the birth of the Plaintiff more fully described in the pleadings in this case known as <u>Dylan McQuitty, minor, by and through his Parents and Next Friends Peggy McQuitty and Gary McQuitty v. Donald Spangler, M.D., et al.</u>, Circuit Court for Baltimore County, Maryland, Case No. 03-C-01-009276, (the Lawsuit) occurring as a result of the birth and delivery of Dylan McQuitty on May 8, 1995 in Baltimore County in the State of Maryland, claiming, [*inter alia*], that Releasees acted in a manner so as to create civil liability and do further state:

* * *

3.      For the same consideration as aforesaid, however, the Plaintiff does not release or in any way discharge Donald Spangler, M.D., individually, or Drs. Glowacki, Elberfeld & Spangler, P.A., its agents, servants and/or employees other than the Defendant, herein referred to as "co-defendants" or any and all other persons; firms, corporations, associations, both known and unknown, whose acts or failures to act as agents, servants and/or employees, and predecessors and/or successors of the co-defendants and each of them, would, have, or do create in co-defendants and each of them the status of tort[-]feasors.

* * *

7.      Plaintiff further agrees that the consideration set forth above is specifically applicable to their agreement that they will not join or attempt to join Releasees, their heirs, executors, administrators, insurers, successors and assigns, in any capacity, in any action that may be brought against them arising out of the subject matter of The Lawsuit as desired above.

- 39 -

8.  That, in consideration of the monies paid, Plaintiff covenants that wrongful death primary beneficiaries and secondary beneficiaries, known and unknown will not maintain any potential action for wrongful death, which stems from the subject matter of The Lawsuit. Plaintiff covenants that his heirs, executors, administrators, successors and assigns will not maintain any potential action for survival to include, but not necessarily limited to, funeral expenses. . . .

In *Mummert*, 435 Md. at 222, 77 A.3d at 1057, we observed that "whether a release by the decedent bars a wrongful death claim by [the decedent's] beneficiaries depends in part on the sweep of the language of the particular release."

Here, the "sweep of the language" in the Elberfeld release does not preclude Respondents' wrongful death action. The relevant provisions of the release reveals that Dylan executed a covenant with Dr. Elberfeld, and that in consideration of the monies paid by Dr. Elberfeld, that neither Dylan nor his beneficiaries would "join or attempt to join" Dr. Elberfeld, his agents and assigns, in any future wrongful death or survival action arising out of the lawsuit. The release does not reflect that Petitioners offered any consideration towards the settlement, and Petitioners' inclusion on the release was for the sole purpose of excluding them from any benefit therefrom.

Thus, we are not persuaded that the Elberfeld release was a general release because the "covenant not to sue" in paragraph eight did not clearly define the recipient at the time the covenant was made. The release unambiguously reveals that the clearly defined recipient was Dr. Elberfeld, which did not constitute a release of all joint tort-feasors. Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**

- 40 -